SA:SK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

14 M 815

- - - - - - - - - - - - - - - - - - - X

In the Matter of the Search of:

THE PREMISES KNOWN AND DESCRIBED AS
THE STORES SET FORTH IN ATTACHMENT A
AND CLOSED AND LOCKED CONTAINERS
THEREIN

- - - - - - - - - - - - - - - - - - - X

TO BE FILED UNDER SEAL

AFFIDAVIT IN
SUPPORT OF A
SEARCH WARRANT

(T. 7, U.S.C., § 2024; T. 18, U.S.C.,
§§ 2, 371 and 641)

EASTERN DISTRICT OF NEW YORK, SS:

ELIZABETH GREANEY, being duly sworn, deposes and states that she is a
Special Agent with the United States Department of Agriculture, Office of Inspector General
("USDA-OIG"), duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that there is
located in THE PREMISES KNOWN AND DESCRIBED AS THE STORES SET FORTH
IN ATTACHMENT A and all locked and closed containers found therein (collectively, the
"SUBJECT PREMISES"), the things described in Attachment B, which constitute evidence,
fruits, and instrumentalities of food stamp benefit fraud, in violation of Title 7, United States
Code, Section 2024, conspiracy to commit food stamp benefit fraud, in violation of Title 18,
Untied States Code, Section 371, and theft of public money, in violation of Title 18, United
States Code, Section 641 (collectively, the "Offenses").

1

The source of your deponent's information and the grounds for her belief are as follows:[1]

1.      I am a Special Agent with the United States Department of Agriculture, Office of Inspector General ("USDA-OIG") and have been a Special Agent with USDA-OIG since January 2011. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for federal food stamp benefit offenses in the United States. I have attended training at the Federal Law Enforcement Training Center in Glynco, Georgia, and obtained a Master of Science degree in Forensic Science. Working as a Special Agent, I have been involved in numerous investigations relating to food stamp benefit fraud, food stamp benefit trafficking and other violations of federal law, including violations of Title 7, United States Code, Section 2024 and Title 18, United States Code, Sections 371 and 641. These investigations are conducted both in an undercover and overt capacity. During the course of these investigations, I have conducted surveillance, executed search warrants, debriefed witnesses, and reviewed documents related to fraud schemes. I have received training in various investigative techniques including, but not limited to, the execution of search warrants. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested search warrants, I have not set forth each and every fact learned during the course of the investigation.

2.      I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from my own observations, reports made to me by other law enforcement officers, and review of records from USDA-OIG and other government agencies.  In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

3.      USDA-OIG is investigating unlawful food stamp benefit fraud. Specifically, USDA-OIG is investigating individuals and entities that unlawfully process food stamp benefits without being authorized to do so by the USDA and unlawfully exchange cash for food stamp benefits.

## BACKGROUND

A.    The "SNAP" Program and Authorized Retailers

4.      The federal government, through the United States Department of Agriculture, Food and Nutrition Service ("FNS"), administers the Supplemental Nutrition Assistance Program ("SNAP").

5.      SNAP was formerly called and known as the "Food Stamp Program." SNAP utilizes federal tax dollars to subsidize low-income households, affording such households the opportunity to achieve a more nutritious diet by increasing their food-purchasing power.  SNAP is the new name of the Food Stamp Program, as a result of the Food, Conservation, and Energy Act of 2008 (P.L. 110-246), also known as the Farm Bill. The new name, effective October 1, 2008, more accurately reflects the program's mission to provide food assistance and nutrition education to assist participants as they move

3

to a healthier lifestyle and self-sufficiency.

6.     In New York, individuals who receive SNAP benefits ("Recipients") no longer redeem their benefits by using paper food stamps coupons. Recipients now redeem their SNAP benefits electronically through the use of what is known as an Electronic Benefits Transfer ("EBT") card. The SNAP EBT cards operate much like automated teller machine (ATM) cards used by banks. At the beginning of each month, a Recipient's EBT card is credited with a dollar amount of food stamps benefits for that month.

7.     The EBT cards are used by Recipients to purchase eligible food items at retail food stores ("retailers") that are authorized by FNS to participate in SNAP and have EBT terminals located in the stores. As a purchase is made, the retailer runs the EBT card through the EBT terminal. The Recipient enters a personal identification number ("PIN") on a keypad, and the amount of the purchase is deducted from the Recipient's EBT card. The EBT terminal generates a receipt for each transaction, and the balance remaining in the Recipient's account for the month is displayed on the receipt. The amount of the Recipient's purchase is then electronically credited to the retail food store owner's bank account, via previous arrangements between the retailer or representative and the FNS.

8.     SNAP benefits may be accepted by authorized retailers only in exchange for eligible food items. According to FNS regulations, most edible items, with the exception of prepared foods, vitamins, and medicines, are eligible for purchase with SNAP benefits. Items such as beer, cigarettes, paper goods, and soaps are not eligible for purchase with SNAP benefits and it is a violation of the rules and regulations governing SNAP to allow SNAP benefits to be used to purchase ineligible items. SNAP benefits may not

4

lawfully be exchanged for cash under any circumstances. Exchanging SNAP benefits for cash is known as "trafficking," and is a violation of the rules and regulations governing SNAP. Lastly, retailers may not permit Recipients to run credit accounts and pay off such accounts with SNAP benefits from their EBT cards. Doing so is a violation of the rules and regulations governing the SNAP.

        9.     All retailers, prior to receiving authorization to participate in SNAP and to process EBT transactions for Recipients, must submit to FNS an Application for Authorization to Participate in SNAP. By executing the application, the applicant attests that he has read the Warnings & Certification that is sent to retailers along with the application documents. The Warnings & Certification provides that, by his/her signature on the application, the applicant is attesting to understanding that he/she, and the persons on behalf of whom the application is submitted, are responsible for ensuring that all employees at the store, both paid and unpaid, comply with SNAP rules and avoid engaging in unauthorized activity, that SNAP authorization may not be transferred to new owners, partners, or corporations, that an unauthorized individual or firm accepting or redeeming SNAP benefits is subject to substantial fines and administrative sanctions, and that violations of SNAP rules can result in criminal prosecution and sanctions. This application, the truthfulness of which must be affirmed by the applicant, also requires the applicant to disclose certain information about the applicant's store to FNS so FNS can determine whether the applicant is eligible to participate in SNAP. The required information includes, inter alia, the store's actual or estimated annual gross sales and food sales, the types of products sold, the number of individuals employed, the quantity and type of cash registers used, and the bank account

designated to deposit all SNAP proceeds. All applicants also receive training from FNS regarding proper conduct as a participating retailer in SNAP. The training makes clear that SNAP prohibits exchanging SNAP benefits for cash and selling ineligible items.

10. SNAP benefits may be accepted only by retailers authorized to participate in SNAP by FNS. Once FNS authorizes a retailer to accept SNAP benefits, FNS issues the retailer a SNAP permit and a unique authorization number (the "FNS authorization number"). FNS uses the FNS authorization number to identify the retailer and track redemptions. A retailer that does not possess a SNAP permit and FNS authorization number may not accept or redeem SNAP benefits. Each store location must have a separate SNAP permit. If a store changes ownership, moves, or closes, its SNAP permit is void. A SNAP permit is not transferable.

11. A typical, legitimate transaction, utilizing an EBT card, would occur as follows: an authorized Recipient, carrying his or her own EBT card, would enter a retail store authorized by FNS to accept SNAP benefits. The Recipient would gather non-prepared food items that are eligible for purchase with SNAP benefits. The Recipient would present those items to the store clerk for purchase, along with his/her EBT card. The clerk would add the total cost of all items presented for purchase and enter that amount into the store's EBT terminal. The EBT card would then be "swiped" as is done with credit and ATM cards, the Recipient would enter a secret personal identification number, and, if the EBT card had a SNAP balance sufficient to cover the purchase total, the transaction would be completed. The total amount of the purchase would be electronically deducted from the Recipient's card balance. That same amount also would be electronically transferred to the retailer's

6

designated bank account, using federal funds that originate from FNS.

12.     As a result of my training and experience, I have become familiar with a number of schemes employed by individuals and entities to defraud SNAP. Sometimes retailers permit Recipients to purchase ineligible items with SNAP benefits, charging Recipients a premium for allowing them to do so. Sometimes retailers permit Recipients to run credit accounts, often involving ineligible items, and to pay off such accounts using SNAP benefits and their EBT cards. Sometimes retailers exchange SNAP benefits for cash, which as explained above, is known as trafficking.

13.     Retailers who exchange SNAP benefits for cash usually do so at a discounted rate, e.g., 50 to 70 percent of the full value of the SNAP benefits. For example, a retailer engaging in trafficking would enter a $100 transaction against a Recipient's EBT card balance and give the Recipient only $50 or $70 in cash, depending upon the discount rate. This practice results in profiteering by traffickers, misuse of government funds intended to provide food for needy families, and the creation of a market for stolen or fraudulently obtained SNAP benefits.

14.     JP Morgan Chase is the EBT-processing company in New York, responsible for EBT transactions and recordkeeping. A retailer may obtain an EBT terminal from JP Morgan Chase or from a third-party vendor. A retailer may obtain more than one EBT terminal for a particular store, and each EBT terminal may be connected to a separate bank account, even though it shares the same FNS authorization number. In a typical transaction, an authorized retailer accepts SNAP benefits from a Recipient and, through wire transfers from JP Morgan Chase, receives dollar-for-dollar credit from USDA-appropriated

7

funds; if the retailer utilized an EBT terminal obtained from a third-party vendor, the retailer then remits a fee to the third-party vendor.

15.     Many retailers are aware that FNS is able to detect and monitor certain types of suspicious EBT transactions. Large SNAP transactions of $100 or more, especially those that total an even-dollar amount, are one such category of transactions that can raise suspicion and invite scrutiny. Accordingly, retailers who engage in trafficking often attempt to avoid detection by running two or more EBT transactions within a short time period, often just a minute or two apart. For example, a retailer engaging in trafficking might run two back-to back transactions in the amounts of $61.91 and $58.09. Doing so enables the retailer to run a large, even-dollar total transaction (i.e., $120) without an even-dollar amount showing up in the transaction record (i.e., $61.91 and $58.09). FNS, however, is now able to track these rapid or "back-to-back" transactions. Sometimes a retailer will insist that Recipients leave their EBT cards with the retailer and provide their personal identification numbers to the retailer. This enables the retailer to engage in trafficking by running several relatively small EBT transactions with the Recipients' cards over an extended period of time -- perhaps days -- thereby making it difficult for FNS to detect the trafficking.

B.     Fowzi Naji Tareb and His Scheme with the Unauthorized Retailers

16.     Century Payments Inc., a WorldPay Company ("WorldPay"), is a payment processing company. It is also a third-party vendor and distributor of EBT terminals. WorldPay charges a fee per EBT transaction conducted on one of its EBT terminals.

17.     FOWZI NAJI TAREB, is an Agent of WorldPay. TAREB solicits

8

retailers to enter into contracts with WorldPay for payment processing services and provides retailers with EBT terminals. In return for facilitating these contracts and providing retailers with EBT terminals, TAREB receives compensation from WorldPay.[2]

18.     As further set forth below, through the course of my investigation, I have learned that TAREB uses his position with WorldPay to knowingly supply EBT terminals to retailers that are not authorized to accept SNAP benefits and to facilitate those retailers' unauthorized acceptance and redemption of SNAP benefits.

19.     As part of my investigation, I surveilled various locations where EBT terminals are located. On or about December 16, 2013, I visited the retailer Candy & Grocery Corp. located at 2827 Cropsy Avenue, Brooklyn, New York ("Candy & Grocery Corp."). At the retailer, I observed an advertisement for EBT transactions; the advertisement had on it the name "Ozzie" and the telephone number 917-856-4750 ("TAREB's telephone number").[3] I interviewed a clerk in the retailer; the clerk stated, in sum and substance and relevant part, that one of his brothers operated the retailer. I left a telephone number ("my contact telephone number") with the clerk and asked that his brother contact me.

20.     Later that day, I received a telephone call at my contact telephone number from TAREB's telephone number. The caller identified himself as "Ozzie."

_____

[2] On September 18, 2014, a warrant for TAREB's arrest was issued for violations of Title 18, United States Code, Sections 2 and 641, by the Honorable Roanne L. Mann, United States Magistrate Judge, in the Eastern District of New York.
[3] I observed the same advertisement at a retailer located at 1208 Nostrand Avenue, Brooklyn, New York. In December 2013, both Candy & Grocery Corp. and the retailer located at 1208 Nostrand Avenue, Brooklyn, New York were authorized SNAP participants and used EBT terminals.

Based on my investigation, "Ozzie" is FOWZI NAJI TAREB.[4] During the calls, TAREB

stated, in sum and substance and relevant part, that: he had been an Account Executive at

WorldPay for six years, and he used EBT terminals provided by WorldPay for processing

EBT transactions at Candy & Grocery Corp.

21.     On or about January 23, 2014, a confidential informant working with

USDA-OIG ("CI-1")[5] called TAREB's telephone number from a cellular telephone provided

by USDA-OIG ("CI-1's telephone number") and spoke with TAREB. CI-1, in sum and

substance and relevant part, identified himself as the operator of a retailer located in Jamaica,

New York ("CI-1's retail location" or "his retail location"), indicated that his retail location

was not authorized by FNS to accept SNAP benefits, and asked whether he could,

nevertheless, obtain an EBT terminal for his retail location. TAREB asked, in sum and

substance and relevant part, how CI-1 had obtained TAREB's name and TAREB's telephone

number. CI-1 responded that he had obtained the information from a delivery driver in his

---

[4] A search of law enforcement databases and records from AT&T revealed that
TAREB's telephone number is associated with FOWZI NAJI TAREB. WorldPay personnel
records for TAREB list his name as "Ozzie." In addition, I have reviewed the New York
State driver's license of FOWZI N. TAREB and compared the photograph to video footage
of the individual known as "Ozzie" and they appear to be the same person.

[5] CI-1's information has been corroborated by independent evidence, including
consensual recordings, telephone records, and observations by law enforcement.
Specifically, law enforcement officers conducted audio-recordings of each of CI-1's
telephone calls with TAREB discussed in this affidavit and audio- and video-recordings of
each of CI-1's meetings with TAREB discussed in this affidavit. Where conversations
occurred in Arabic; I received a summary translation for purposes of this investigation. CI-1
has prior convictions for assault and disorderly conduct. During debriefing, CI-1 advised the
government that CI-1 had been involved in allegations of theft of public money from a state
lottery system. CI-1 acts as an informant in exchange for assistance in facilitating FNS
authorization for his retail location. Prior to this investigation, CI-1 acted as an informant in
exchange for payment.

10

area. TAREB stated that he would have to call CI-1 back in about five minutes. The telephone call then ended.

22. Approximately five minutes later, CI-1's telephone number received a telephone call from TAREB's telephone number. CI-1 did not answer the call and let the telephone call go to voicemail. Immediately afterwards, CI-1, using CI-1's telephone number, called TAREB's telephone number and spoke with TAREB. TAREB answered the call and asked for more information about how CI-1 had obtained TAREB's name and TAREB's telephone number. CI-1 responded, in sum and substance and relevant part, that he had obtained the information from a delivery driver who gave the information to CI-1 after CI-1 had told the driver about problems his retail location was having with the USDA and EBT terminal. CI-1 further stated that, two weeks prior, his retail location's EBT terminal had stopped working because he did not respond to reauthorization requests from the USDA. TAREB stated, in sum and substance and relevant part, that because the machine was government-owned, the government would ask a lot of questions and request a lot of information, and that if CI-1's retail location obtained an EBT terminal owned by a private company then the retail location would not have to answer all of those questions. TAREB further stated, in sum and substance and relevant part, "don't worry I'll come hook you up." CI-1 and TAREB agreed to meet on January 30, 2014 at CI-1's retail location.

23. On January 30, 2014, at approximately 12:51 p.m., CI-1, using CI-1's telephone number, called TAREB's telephone number, identified himself, and asked when TAREB would be arriving at CI-1's retail location. TAREB stated, in sum and substance and relevant part, that he would arrive in 25 minutes to an hour.

24.     Later that day, at approximately 1:47 p.m., CI-1 entered his retail location from the rear entrance. CI-1 observed TAREB at the front of his retail location. CI-1 and TAREB then engaged in the following conversation, in sum and substance and relevant part:

a.     CI-1 showed TAREB the USDA paperwork requesting information required to reauthorize his retail location to participate in SNAP. CI-1 explained that his retail location was owned by his uncle, who he indicated was in Yemen, and that, as a result, CI-1 would not be able to get the information to the USDA in a timely manner, but would be able to do so in March when his uncle returned. CI-1 further explained that his retail location was losing money and clients due to the absence of an EBT terminal, and that the retail location had already stopped using its debit/credit card machine due to cost.

b.     TAREB explained that he had a "girl in the bank" who helped him and stated that he needed $1,000 cash in order to hook up an EBT terminal. The $1,000 cash was separate and apart from the fee ordinarily charged by WorldPay for installation of an EBT terminal. TAREB further stated that he would only profit $300 from the deal because he had to pay the "girl" as well. TAREB further explained the fees associated with use of the EBT terminal: 6 cents for every EBT transaction and 5 cents for every debit or credit card transaction. TAREB stated that he required a voided check, $100 upfront to start the process, and information to complete the application, including the owner/operator's name, date of birth, and social security number. TAREB instructed CI-1 to text the information to TAREB's telephone number. TAREB also requested a copy of the retail location's business certificate and the debit/credit card machine that the retailer had stopped

using (see supra ¶ 24(a)).  TAREB stated that he would return Monday or Tuesday to set up the new EBT terminal and advised that the terminal would only be for temporary use until the retail location could get its paperwork in and become reauthorized.

   c. TAREB asked CI-1 if the retail location conducted "illegal transactions" including exchanging SNAP benefits for cash.  CI-1 responded that people had asked to engage in such transactions but that he was too scared to do it.  TAREB stated, in sum and substance and relevant part, that CI-1 should get to know people first and that, once he did, he could carry out such transactions.

   d. TAREB asked CI-1 again how CI-1 had obtained TAREB's name and TAREB's telephone number.  CI-1 stated that a delivery driver who works along Jamaica Avenue in Queens, New York gave him the information.

   e. CI-1 asked TAREB about his competition.  TAREB stated that another individual was providing EBT terminals but that the other provider was not reliable.

   25. Between January 31, 2014 and February 3, 2014, I engaged in a text message conversation using CI-1's telephone number.  On January 31, 2014, I sent a text message from CI-1's telephone number to TAREB's telephone number with the information TAREB requested to complete the application: the name of CI-1's retail location, as well as its owner/operator's name, date of birth, and social security number.  On February 2, 2014, TAREB, using TAREB's telephone number, sent a text message to CI-1's telephone number requesting the "Address on I'd," apparently requesting the address on the owner/operator's identification card.  On February 3, 2014 (a Monday), I, using CI-1's telephone number, exchanged the following text messages with TAREB's telephone number:

| | |
|---|---|
| CI-1: | 1220 Ocean Ave Apt 3C Brooklyn, NY 11230 |
| TAREB: | OK |
| CI-1: | Good 4 2morrow? Wat time? |
| TAREB: | Inshallah |
| TAREB: | 4-5 o'clock |

26.    On February 4, 2014 (a Tuesday), between approximately 4:30 p.m. and 7:45 p.m., I, using CI-1's telephone number, exchanged the following text messages with TAREB's telephone number:

| | |
|---|---|
| CI-1: | What time r u coming cause I don't want to keep the money in the store |
| TAREB: | Few hours I'm in Bronx |
| CI-1: | Will it be later than 8? |
| TAREB: | K |
| CI-1: | What going on are you coming or not cos I have to leave after 1 hour |
| TAREB: | I'm still in Bronx |
| CI-1: | Call me |
| TAREB: | Few minute |

27.    On February 4, 2014, at approximately 7:48 p.m., TAREB, using TAREB's telephone number, called CI-1's telephone number.  CI-1 answered the call and CI-1 and TAREB discussed the new EBT terminal that TAREB would provide for CI-1's retail location.  TAREB explained, in sum and substance and relevant part, that: he was in the Bronx hooking up a couple of machines; he was unable to do them the previous day

14

because of a snow storm; and that his cousin also had an issue with a machine and that he, TAREB, had to help his cousin as well. TAREB promised to be at CI-1's retail location on Wednesday. TAREB and CI-1 agreed to meet at CI-1's retail location at 4:00 p.m. on Wednesday, February 5, 2014. CI-1 stated to TAREB that if TAREB did not come to the meeting, CI-1 wanted his money back. CI-1 further explained that he was losing clients and really wanted to get this done soon.

28.     On February 5, 2014 (a Wednesday), at approximately 4:05 p.m., I, using CI-1's telephone number, exchanged the following text messages with TAREB's telephone number:

> CI-1:        Where you at
>
> TAREB:      On my way

29.     On February 5, 2014, at approximately 4:55 p.m., TAREB arrived at CI-1's retail location and met with CI-1. CI-1 and TAREB then engaged in the following conversation, in sum and substance and relevant part:

a.      TAREB asked CI-1 whether CI-1 had received a box with a machine in it. CI-1 responded that he had not. TAREB explained that CI-1's retail location could use one of the terminals that TAREB had with him for now. TAREB further explained that when CI-1 received the box from the company, CI-1 should call or text TAREB so that TAREB could retrieve his terminal.

b.      TAREB went behind the counter of CI-1's retail location and connected an EBT terminal, which also accepted debit and credit cards.

c.      Subsequently and in CI-1's presence, TAREB made a telephone

15

call to WorldPay to activate the EBT terminal.  TAREB asked to speak with a particular female individual, who was not available; instead, another individual spoke with TAREB and helped him activate the EBT terminal.

       d.     TAREB used a test debit/credit card that he had with him to test the EBT terminal.  He swiped the test debit/credit card through the EBT terminal and kept the receipts.

       e.     TAREB then asked if CI-1 had an EBT card.  CI-1 responded that he did not.  TAREB asked a few patrons in CI-1's retail location if they had EBT cards, and they responded that they did not.  TAREB then referenced text messages in his cellular telephone and accessed what appeared to be three EBT card numbers and their associated personal identification numbers ("PINs") and first names.  TAREB opened the text message for "Julio" and entered the EBT card number in the text message and associated PIN to process a 1 cent purchase through the EBT terminal.  While doing so, TAREB stated, in sum and substance and relevant part, that the guy had $27 on the card yesterday and now only had $9.  When CI-1 asked TAREB why he was running a transaction for only 1 cent, TAREB responded that he could not take more from the card because the guy would notice it.[6]

       f.     CI-1 gave TAREB $900 in U.S. currency.[7]  TAREB did not count the money, immediately placed the money in his pocket, and stated to CI-1, "I trust you."

---

    [6] Records from JP Morgan Chase indicate that, on February 5, 2014, at approximately 5:39 p.m., a 1 cent transaction was run on an EBT terminal located at CI-1's retail location on an EBT card assigned to "Julio Mendez."

    [7] USDA-OIG agents provided CI-1 with $900 in U.S. currency immediately prior to this meeting.

g.    TAREB then showed CI-1 how to use the EBT terminal he had installed and indicated that the terminal did not require a password.

h.    TAREB reiterated that the EBT terminal he had provided to CI-1 was temporary and that it might take a month or so after CI-1's retail location was reauthorized for CI-1 to get an authorized terminal in place.

i.    Before leaving, TAREB asked CI-1 if CI-1 knew anyone else who needed a terminal for their store. CI-1 responded that he did not at that time.

30.    Subsequently, CI-1 swiped three undercover EBT cards (provided by me) through the unauthorized EBT terminal that TAREB had installed at CI-1's retail location. Records from JP Morgan Chase indicate that the unauthorized EBT terminal was associated with an FNS authorization number assigned to another retailer (rather than CI-1's retail location); the other retailer was located in Brooklyn, New York and was authorized by FNS to participate in SNAP on January 30, 2014. Moreover, FNS records indicate that CI-1's retail location and TAREB were not authorized to employ that FNS authorization number. As set forth above, FNS authorization numbers are unique to the retailer and owner.

31.    I conducted further investigation to determine additional instances in which TAREB used his position with WorldPay to knowingly supply EBT terminals to retailers that were not authorized to accept SNAP benefits. My investigation included obtaining records from WorldPay pertaining to TAREB (including his contracts with retailers) and records from JP Morgan Chase pertaining to EBT transactions (including their associated EBT terminals and FNS authorization numbers). Based on my investigation, I have identified additional retailers (referred to herein as the "SUBJECT PREMISES") using

17

unauthorized EBT terminals provided by TAREB.  Additional information regarding those retailers is set forth below.

## THE SUBJECT PREMISES

A.   SUBJECT PREMISES 1

1.    SUBJECT PREMISES 1 is 258 Marcus Garvey Boulevard, Brooklyn, NY and is owned by Ali Ahmed.

2.    On March 8, 2013, Ahmed entered into a contract with TAREB.[8] Under the contract, TAREB provided EBT terminal LK291015, a terminal capable of processing EBT cards to redeem SNAP benefits.

3.    At the time, SUBJECT PREMISES 1 was authorized to accept SNAP benefits, however SUBJECT PREMISES 1 stopped redeeming SNAP benefits in June 2013 when the location was withdrawn from SNAP for failure to respond to a reauthorization request. Since that time two applications for participating in SNAP were submitted but none were authorized.

4.    On September 26, 2013, Yaqoob Saleem entered into a contract with TAREB.  Under the contract, TAREB provided EBT terminal LK188205, a terminal capable of processing EBT cards to redeem SNAP benefits.

5.    On or about and between June 19, 2013 and August 8, 2014, EBT terminals LK291015 and LK188205 redeemed a total of $232,552.77 in SNAP benefits using various FNS authorization numbers.  FNS authorization number 0390549, used between

---

[8] As set forth above, TAREB is an Agent of WorldPay.  With respect to the contracts described in this affidavit, TAREB entered into the contracts in his capacity as an Agent of WorldPay.

18

approximately July 2, 2014 and at least August 8, 2014, was assigned to Msfachr United and

FNS authorization number 0330881, used between approximately June 19, 2014 and July 1,

2014, was assigned to God Bless Food Mart, both of which are retailers authorized by FNS

to accept SNAP benefits, and not located at SUBJECT PREMISES 1.

B.    SUBJECT PREMISES 2

6.    SUBJECT PREMISES 2 is 161 Buffalo Avenue, Brooklyn, NY and is

owned by Dwayne Whitaker.

7.    On February 21, 2014, Dwayne Whitaker entered into a contract with

TAREB.  Under the contract, TAREB provided EBT terminal LK289925, a terminal capable

of processing EBT cards to redeem SNAP benefits.

8.    At the time, SUBJECT PREMISES 2 was not authorized to accept SNAP

benefits.  There has never been an authorized store at that location.

9.    On or about and between February 23, 2014 and September 4, 2014,

SUBJECT PREMISES 2 using EBT terminal LK289925 redeemed $30,018.76 in SNAP

benefits using two FNS authorization numbers.  On or about and between February 23, 2014

and June 5, 2014, SUBJECT PREMISES 2 used FNS authorization number 4202872 which

is assigned to Tejada Grocery Stores, a retailer previously authorized by FNS to accept

SNAP benefits, and not located at SUBJECT PREMISES 2.  On or about and between June

12, 2014 and September 4, 2014, SUBJECT PREMISES 2 used FNS authorization number

0409569 which is assigned to Azy Deli Corp, a retailer previously authorized by FNS to

accept SNAP benefits, and not located at SUBJECT PREMISES 2.

19

C.    SUBJECT PREMISES 3

10.    SUBJECT PREMISES 3 is 636 Throop Avenue, Brooklyn, NY and is owned by Sulhiman Mubarez.

11.    On December 3, 2013, Sulhiman Mubarez entered into a contract with TAREB.  Under the contract, TAREB provided EBT terminal LK2445138, a terminal capable of processing EBT cards to redeem SNAP benefits.

12.    At the time, SUBJECT PREMISES 3 was not authorized to accept SNAP benefits.  There has never been an authorized store to accept SNAP benefits at that location.

13.    On or about and between May 2, 2014 and September 4, 2014, EBT terminal LK245138 redeemed $47,331.36 in SNAP benefits using FNS authorization number 0409569.  That FNS authorization number was assigned to Azy Deli Corp, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 3.

D.    SUBJECT PREMISES 4

14.    SUBJECT PREMISES 4 is 1060 Fulton Street, Brooklyn, NY and is owned by Mohamed Al-Marisi.

15.    On September 7, 2013, Mohamed Al-Marisi entered into a contract with TAREB.  Under the contract, TAREB provided EBT terminal LK169736, a terminal capable of processing EBT cards to redeem SNAP benefits.

16.    At the time, SUBJECT PREMISES 4 was not authorized to accept SNAP benefits.  On May 31, 2014, SUBJET PREMISES 4 had their application, signed by Mohamed Al-Marisi, considered withdrawn after a request for information was not answered.  FNS will

20

frequently request additional information not provided by an applicant; in this instance FNS did not receive the requested information within the required 30 days. The previously authorized store at the location was disqualified for SNAP violations on September 27, 2011.

17.     On or about and between September 10, 2013 and February 16, 2014, EBT terminal LK169736 redeemed $68,640.72 in SNAP benefits using FNS authorization number 0368565. That FNS authorization number was assigned to Ami Convenient Deli, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 4. On or about and between February 18, 2014 and June 14, 2014, EBT terminal LK169736 redeemed $64,902.71 using FNS authorization number 0748633, which was assigned to Angelisa Food Corp, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 4. SUBJECT PREMISES 4, starting on or about June 14, 2014 began using EBT terminal LK352642. Through August 8, 2014, EBT terminal LK352642 redeemed $28,324.58 using the authorization number assigned to Angelisa Food Corp, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 4.

18.     On March 10, 2014, a confidential informant working with the USDA-OIG ("CI-2") entered SUBJECT PREMISES 4 with an undercover EBT card.[9] CI-2 located a bag of chips and orange juice and presented the undercover EBT card to the clerk. The

---

[9] CI-2's information has been corroborated by independent evidence, including consensual recordings and observations by law enforcement. CI-2 has numerous prior convictions including for possessing stolen property and possessing forged instruments. During debriefing, CI-2 advised the government that CI-2 had been involved in selling SNAP benefits for cash and had since lost her SNAP benefits. CI-2 acts as an informant in exchange for payment.

clerk charged the card $2.50. The receipt identified the terminal as LK169736. JP Morgan Chase records show the transaction was conducted using the FNS authorization number 0748633, which is assigned to a retailer not located at SUBJECT PREMISES 4.

E.    SUBJECT PREMISES 5

19.    SUBJECT PREMISES 5 is 532 Gates Avenue, Brooklyn, NY and is owned by Yahya Ahmed and Hemyar Kassim.

20.    On September 22, 2013, Yahya Ahmed entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK185325, a terminal capable of processing EBT cards to redeem SNAP benefits. On December 17, 2013, Hemyar Kassim entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK251489, a terminal capable of processing EBT cards to redeem SNAP benefits.

21.    At the time, SUBJECT PREMISES 5 was not authorized to accept SNAP benefits. Yahya Ahmed submitted an application on or about September 17, 2013. It was considered withdrawn on December 28, 2013 after FNS did not receive information it requested within 30 days as required. On or about August 8, 2014, Hemyar Kassim submitted an application to participate in SNAP. The application was considered withdrawn on or about August 19, 2014 when the applicant failed to provide the requested information within 30 days as required by FNS.

22.    On or about and between September 26, 2013 and December 6, 2013, EBT terminal LK185325 redeemed $25,982.94 in SNAP benefits and then switched to terminal LK251489 on or about December 18, 2013 through March 12, 2014. SUBJECT PREMISES 5 used FNS authorization number 0385347 which is assigned to Sajoma Deli

22

and Food, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 5. On or about and between March 12, 2014 and August 8, 2014, SUBJECT PREMISES 5, using EBT terminal LK251489, redeemed SNAP benefits in the amount of $95,915.88 using FNS authorization number 0748633 which is assigned to Angelisa Food Corp, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 5.

F.     SUBJECT PREMISES 6

23.     SUBJECT PREMISES 6 is 715 Dumont Avenue, Brooklyn, NY and is owned by Majed Eltobah.

24.     On December 8, 2013, Majed Eltobah entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK248048, a terminal capable of processing EBT cards to redeem SNAP benefits.

25.     At the time, SUBJECT PREMISES 6 was not authorized to accept SNAP benefits. On November 22, 2013, SUBJECT PREMISES 6, with Majed Eltobah as the owner, was disqualified from participating in SNAP. No stores have been authorized at the location -- and no applications have been submitted for the location -- of SUBJECT PREMISES 6.

26.     On or about and between December 11, 2013 and August 8, 2014, EBT terminal LK248048 redeemed $131,327.74 in SNAP benefits. SUBJECT PREMISES 6 used FNS authorization number 0344759, which is assigned to Deli on 5th, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 6.

23

G.   SUBJECT PREMISES 7

27.    SUBJECT PREMISES 7 is 3602 Neptune Avenue, Brooklyn, NY and is owned by Dana Jones.

28.    On July 15, 2013, Dana Jones entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK101575, a terminal capable of processing EBT cards to redeem SNAP benefits.

29.    At the time, SUBJECT PREMISES 7 was not authorized to accept SNAP benefits. On June 13, 2013, SUBJECT PREMISES 7 was considered withdrawn from SNAP when the owner, Dana Jones failed to submit information required for reauthorization. No applications have been submitted for the location since then.

30.    On or about and between July 16, 2013 and October 27, 2013, EBT terminal LK101575 redeemed $33,668 in SNAP benefits using FNS authorization number 0138710, which was assigned to a retailer not located at SUBJECT PREMISES 7.  On or about and between October 31, 2013 and March 13, 2014, SUBJECT PREMISES 7 used EBT terminal LK216012 and redeemed $52,399.76 using authorization number 0138710. That FNS authorization number was assigned to Great Food Gourmet, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 7.  On or about and between March 13, 2014 and August 8, 2014, SUBJECT PREMISES 7 used EBT terminal LK299806 and redeemed $61,329.64 using FNS authorization number 0368565, which was assigned to Ami Convenient Deli, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 7.

24

H.    SUBJECT PREMISES 8

31.    SUBJECT PREMISES 8 is 603 Clinton Street, Brooklyn, NY and is owned by Ebrahim Mohamed.

32.    On March 29, 2014, Ebrahim Mohamed entered into a contract with TAREB.  Under the contract, TAREB provided EBT terminal LK315430, a terminal capable of processing EBT cards to redeem SNAP benefits.

33.    At the time, SUBJECT PREMISES 8 was authorized to accept SNAP benefits.  On May 22, 2014, SUBJECT PREMISES 8 was authorized to participate in SNAP with Ebrahim M. Mohamed as the owner.  The store redeemed a total of $177 in June 2014 using a JP Morgan Chase EBT terminal with no other redemptions during subsequent months.

34.    On or about and between April 14, 2014 and September 7, 2014, EBT terminal LK315430 redeemed $23,984.66 in SNAP benefits using FNS authorization number 0447345.  That FNS authorization number was assigned to Slim Deli Corp, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 8.

I.    SUBJECT PREMISES 9

35.    SUBJECT PREMISES 9 is 782 Franklin Avenue, Brooklyn, NY and is owned by Abdulfatah Saleh.

36.    On May 11, 2014, Abdulfatah Saleh entered into a contract with TAREB.  Under the contract, TAREB provided EBT terminal number LK338747, a terminal capable of processing EBT cards to redeem SNAP benefits.

25

37.     At the time, SUBJECT PREMISES 9 was not authorized to accept SNAP benefits. On January 14, 2011 an application submitted by Anor Y. Kassim was considered withdrawn when the applicant did not answer a request for information for thirty days as required by FNS. On September 1, 2014, Abdulfatah S. Salah submitted an application for SUBJECT PREMISES 9; no decision has been made.

38.     On or about and between May 15, 2014 and August 8, 2014, EBT terminal LK338747 redeemed $17,999.17 in SNAP benefits using FNS authorization number 0160217. That FNS authorization number was assigned to Y&Y Farm Corp, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 9.

J.    SUBJECT PREMISES 10

39.     SUBJECT PREMISES 10 is 894 Myrtle Avenue, Brooklyn, NY and is owned by Khaled Nagi.

40.     On February 11, 2014, Khaled Nagi entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK283457, a terminal capable of processing EBT cards to redeem SNAP benefits. Prior to this contract, TAREB entered into contracts as far back as December 2010 at SUBJECT PREMISES 10, including a contract signed on November 25, 2013 with Musa Alqotaini.

41.     On or about December 15, 2010, SUBJECT PREMISES 10 was authorized to participate in SNAP with Abdulla A. Khalid listed as the owner, until June 21, 2012, when it was disqualified. SUBJECT PREMISES 10 was then authorized to participate in

SNAP again on September 11, 2013, with Musa Alqotaini as the owner. The store redeemed between November 2013 and February 2014 using a terminal issued by JP Morgan.

42.    On or about and between December 18, 2012 and August 8, 2014, SUBJECT PREMISES 10 used multiple EBT terminals to redeem SNAP benefits using FNS authorizations not assigned to its location. On or about and between December 18, 2012 and November 22, 2013, the location used EBT terminal LK178073 and redeemed $472,328.82 under FNS authorization number 0377141 which was assigned to A1 Deli Gourmet, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 10. On or about and between February 12, 2014 and May 16, 2014, SUBJECT PREMISES 10 used EBT terminal LK283457 and redeemed $128,146.94 using FNS authorization number 0100040 which was assigned to Araujo Grocery #2, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 10. On or about and between May 16, 2014 and May 20, 2014, SUBJECT PREMISES 10 used EBT terminal LK283457 and redeemed $2,751.14 using FNS authorization number 0390559 which was assigned to Bonita Michoacan LLC, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 10. On or about and between May 20, 2014 and June 2, 2014, SUBJECT PREMISES 10 used EBT terminal LK283457 and redeemed $8,001.58 using FNS authorization number 0390959 which was assigned to Big Fish Market, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 10. On or about and between June 7, 2014 and June 24, 2014, SUBJECT PREMISES 10 used EBT terminal LK283457 and redeemed $23,014.27 using FNS authorization number

27

0390549 which was assigned to Msfachr United, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 10. Using the same authorization number, SUBJECT PREMISES 10 used EBT terminal 518 and redeemed $22,988.84 on or about and between June 25, 2014 and August 8, 2014. None of the authorized terminals were authorized to be at SUBJECT PREMISES 10.

K.      SUBJECT PREMISES 11

43.     SUBJECT PREMISES 11 is 77 Van Buren Street, Brooklyn, NY and is owned by Ahmed Abdul.

44.     On or about August 10, 2013, Ahmed Abdul entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK145023, a terminal capable of processing EBT cards to redeem SNAP benefits.

45.     At the time, SUBJECT PREMISES 11 was not authorized to accept SNAP benefits. On December 31, 2013, SUBJECT PREMISES 11 became authorized with Meqdad Abdulla Saleh as the owner. SUBJECT PREMISES 11 was issued an EBT terminal by JP Morgan Chase which it began using in January 2014.

46.     On or about and between August 22, 2013 and March 18, 2014, SUBJECT PREMISES 11, using EBT terminal LK145023 redeemed $124,997.16 in SNAP benefits using FNS authorization number 0214537. That FNS authorization number was assigned to East Side Gourmet, a retailer previously authorized by FNS to accept SNAP benefits and not located at SUBJECT PREMISES 11. On or about and between March 19, 2014 and April 7, 2014, SUBJECT PREMISES 11, using EBT terminal LK154023 redeemed $6,200.30 using FNS authorization number 0344751. That authorization number is assigned

28

to Heffron Farms Market, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 11. On or about and between April 7, 2014 and August 6, 2014, SUBJECT PREMISES 11, using EBT terminal LK145023 redeemed $58,281.06 in SNAP benefits using FNS authorization number 0344755. That authorization number is assigned to La Rancherita 2, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 11.

47.     On or about February 26, 2014, CI-2 entered SUBJECT PREMISES 11 with an undercover EBT card and located juice and a bottle of Febreeze air freshener, an ineligible item.[10] CI-2 approached the counter where the clerk charged the undercover EBT card $7.00 and returned it along with a receipt. The receipt identified the terminal as 46940E, a JP Morgan Chase issued terminal.

48.     On or about March 3, 2014, CI-2 entered SUBJECT PREMISES 11 with an undercover EBT card and approached the counter. CI-2 asked the clerk for two packs of cigarettes and $50 cash. The clerk charged the undercover EBT card $93.95 and returned it, along with the cash and receipt to CI-2. The receipt identified the terminal used as LK145023.

49.     On or about March 4, 2014, a confidential informant working with the USDA-OIG ("CI-3") entered SUBJECT PREMISES 11 with an undercover EBT card and approached the counter. [11] CI-3 asked the clerk for two packs of cigarettes. The clerk

---

[10] Law enforcement officers conducted audio- and video-recordings of each of the described transactions conducted by CI-2 and CI-3 at SUBJECT PREMISES 11.
[11] CI-3's information has been corroborated by independent evidence, including consensual recordings and observations by law enforcement. CI-3 has prior convictions for robbery and shoplifting. During debriefing, CI-3 advised the government that CI-3 used to exchange SNAP benefits for cash. CI-3 acts as an informant in exchange

charged the card $22 and returned it along with the cigarettes and receipt to CI-3. The receipt identified the terminal used as 46940E.

50.     On March 12, 2014, CI-2 entered SUBJECT PREMISES 11 with an undercover EBT card and approached the counter. CI-2 asked for two packs of cigarettes and $50. The clerk stated that he did not have enough cash but could sell the cigarettes. The clerk charged the EBT card $22 and returned it along with the cigarettes and a receipt to CI-2. The receipt identified the terminal used as 46940E.

51.     On or about April 2, 2014, CI-2 entered SUBJECT PREMISES 11 with an undercover EBT card and approached the counter. CI-2 asked the clerk for $50 cash. The clerk charged the undercover EBT card $80.79 in SNAP benefits and returned it along with the $50 cash and a receipt to CI-2. The receipt identified the terminal used as 46940E.

52.     On or about July 15, 2014, CI-2 entered SUBJECT PREMISES 11 with an undercover EBT card and approached the counter. CI-2 asked the clerk for a pack of cigarettes and $40 cash. The clerk charged the EBT card $70.99 and returned it along with the cash, cigarettes and a receipt to CI-2. The receipt identified the terminal used as 46940E.

L.     SUBJECT PREMISES 12

53.     SUBJECT PREMISES 12 is 772 Blake Ave, Brooklyn, NY and is owned by Imad Said.

---

for payment.

54. On or about January 15, 2013, Imad Said entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK258919, a terminal capable of processing EBT cards to redeem SNAP benefits.

55. At the time, SUBJECT PREMISES 12 was not authorized to accept SNAP benefits. On October 12, 2012 SUBJECT PREMISES 12 was disqualified from participating in SNAP with Imad Said as the owner.

56. On or about and between May 22, 2013 and August 8, 2014, SUBJECT PREMISES 12 using EBT terminal LK258919 redeemed $676,319.95 in SNAP benefits using FNS authorization number 0360763. That FNS authorization number was assigned to 2763 Pitkin Deli, a retailer previously authorized by FNS to accept SNAP benefits and not located at SUBJECT PREMISES 12.

57. On or about February 26, 2014, CI-2 entered SUBJECT PREMISES 12 with an undercover EBT card and located juice before approaching the counter.[12] CI-2 asked the clerk at the counter for two packs of cigarettes and $100 cash. The clerk stated he would charge CI-2 $165 in SNAP benefits for the return of $100 in cash. The clerk took the EBT card, charged it $192.50 and returned it along with the cigarettes, cash, and a receipt to CI-2. The receipt identified the terminal used as LK258919.

58. On or about March 3, 2014, CI-2 entered SUBJECT PREMISES 12 with an undercover EBT card and approached the counter. CI-2 asked for a pack of cigarettes and $100 cash. The clerk stated he would charge $165 in SNAP benefits for the

---

[12] Law enforcement officers conducted audio- and video-recordings of each of the described transactions conducted by CI-2 at SUBJECT PREMISES 12.

return of $100 cash. The clerk charged the EBT card $176.77 and returned it along with the cigarettes, cash and receipt to CI-2. The receipt identified the terminal used as LK258919.

59.     On or about April 2, 2014, CI-2 entered SUBJECT PREMISES 12 with an undercover EBT card and approached the counter. CI-2 asked the clerk for $50 cash. The clerk stated he would charge $80 in SNAP benefits for the return of $50 cash. The clerk charged the EBT card $80.50 and returned it along with the cash and a receipt to CI-2. The receipt identified the terminal used as LK258919.

60.     On or about July 15, 2014, CI-2 entered SUBJECT PREMISES 12 with an undercover EBT card and approached the counter. CI-2 asked the clerk for a pack of cigarettes and cash back for the SNAP benefits on the EBT card. CI-2 explained that the card had $199 on it. The clerk stated that the cigarettes will be $12 and he could give CI-2 $110 in cash in exchange for the remaining $187 in SNAP benefits. The clerk charged the card $198.99 and returned it along with the pack of cigarettes, $110 cash and a receipt to CI-2. The receipt identified the terminal used as LK258919.

M.     SUBJECT PREMISES 13

61.     SUBJECT PREMISES 13 is 333 Pulaski Street, Brooklyn, NY and is owned by Khaled Nagi.

62.     On or about January 7, 2013, Khaled Nagi entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK255029, a terminal capable of processing EBT cards to redeem SNAP benefits.

63.     At the time, SUBJECT PREMISES 13 was not authorized to accept SNAP benefits. On March 9, 2012 SUBJECT PREMISES 13 was considered withdrawn from

32

participating in the SNAP when it failed to cooperate in an investigation. On January 16, 2014,

SUBJECT PREMISES 13 was authorized to participate in SNAP with Musa Alqotaini as the

owner. The store has redeemed under $2,000 a month with several months listed as negative

redemptions on its EBT terminal issued by JP Morgan Chase.

      64.    On or about and between December 1, 2013 and March 19, 2013,

SUBJECT PREMISES 13 using EBT terminal LK241647 redeemed $236,981.16 in SNAP

benefits using FNS authorization number 0368565. That FNS authorization number was

assigned to Ami Convenient Deli, a retailer previously authorized by FNS to accept SNAP

benefits and not located at SUBJECT PREMISES 13. On or about and between August 1,

2013 and November 21, 2013, SUBJECT PREMISES 13, using EBT terminal LK124646

redeemed $278,351.96 using FNS authorization number 0395326. That authorization

number is assigned to Stadium Grocery, a retailer previously authorized by FNS to accept

SNAP benefits, and not located at SUBJECT PREMISES 13. On or about and between

January 29, 2013 and April 9, 2013, using terminal LK255029, and then between April 13,

2013 and July 30, 2013 using terminal LK315353, SUBJECT PREMISES 13 redeemed

$139,065.98 using authorization number 0359472. That authorization number is assigned to

142 Food Center Inc., a retailer previously authorized by FNS to accept SNAP benefits, and

not located at SUBJECT PREMISES 13. On or about and between March 21, 2014 and

September 10, 2014, SUBJECT PREMISES 13, using terminal LK241647 redeemed

$427,158.78 using authorization number 5754585. That authorization number is assigned to

The Eighth Street Mini Mart, a retailer previously authorized by FNS to accept SNAP

benefits, and not located at SUBJECT PREMISES 13.

65.     On or about February 26, 2014, CI-2 entered SUBJECT PREMISES 13 with an undercover EBT card and located juice before approaching the counter. CI-2 asked the clerk at the counter for two packs of cigarettes and $100 cash. The clerk stated he would charge CI-2 $150 in SNAP benefits for the return of $100 in cash. The clerk took the EBT card, charged it $190.49 and returned it along with the cigarettes, cash, and a receipt to CI-2. The receipt identified the terminal used as LK241647.

66.     On or about February 27, 2014, CI-3 entered SUBJECT PREMISES 13 with an undercover EBT card and approached the counter. CI-3 asked the clerk at the counter for two packs of cigarettes and $100 cash. The clerk took the EBT card, charged it $191.49 and returned it along with the cigarettes, cash, and a receipt to CI-3. The receipt identified the terminal used as LK241647.

67.     On or about March 4, 2014, CI-3 entered SUBJECT PREMISES 13 with an undercover EBT card and approached the counter. CI-3 asked the clerk at the counter for two packs of cigarettes and $100 cash. The clerk took the EBT card, charged it $174.83 and returned it along with the cigarettes, cash, and a receipt to CI-3. The receipt identified the terminal used as LK241647.

68.     On or about April 2, 2014, CI-2 entered SUBJECT PREMISES 13 with an undercover EBT card and approached the counter. CI-2 asked the clerk at the counter for $50 cash. The clerk stated he would charge CI-2 $80 in SNAP benefits for the return of $50 in cash. The clerk took the EBT card, charged it $80.21 and returned it along with the cash and a receipt to CI-2. The receipt identified the terminal used as LK241647.

34

69.     On or about July 15, 2014, CI-2 entered SUBJECT PREMISES 13 with an undercover EBT card and approached the counter.  CI-2 asked the clerk at the counter for a pack of cigarettes and $50 cash.  The clerk stated he would charge CI-2 $92.99 in SNAP benefits all together for the cigarettes and return of cash.  The clerk took the EBT card, charged it $92.99 as promised and returned it along with the cigarettes, cash, and a receipt to CI-2.  The receipt identified the terminal used as LK241647.

N.     SUBJECT PREMISES 14

70.     SUBJECT PREMISES 14 is 69 Putnam Avenue, Brooklyn, NY and is owned by Ahmed Abdul.

71.     On or about November 20, 2013, Ahmed Abdul entered into a contract with TAREB.  Under the contract, TAREB provided EBT terminal LK236166, a terminal capable of processing EBT cards to redeem SNAP benefits.

72.     At the time, SUBJECT PREMISES 14 was authorized to accept SNAP benefits.  On December 2, 2013, SUBJECT PREMISES 14 was authorized to participate in SNAP with Tawfiq Abdulla Saleh as the owner.  The store was issued an EBT terminal by JP Morgan Chase.

73.     On or about and between November 22, 2013 and March 19, 2014, SUBJECT PREMISES 14 using EBT terminal LK236166 redeemed $67,142.42 in SNAP benefits using FNS authorization number 0214537.  That FNS authorization number was assigned to East Side Gourmet, a retailer previously authorized by FNS to accept SNAP benefits and not located at SUBJECT PREMISES 14.  On or about and between March 22, 2014 and August 5, 2014, SUBJECT PREMISES 14, using EBT terminal LK236166

35

redeemed $104,942.07 using FNS authorization number 0443722. That authorization number is assigned to Bills' Market, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 14.

74.    On or about March 3, 2014, CI-2 entered SUBJECT PREMISES 14 with an undercover EBT card and approached the counter. CI-2 asked the clerk at the counter for two packs of cigarettes and $100 cash.[13] The clerk stated he would charge CI-2 $150 in SNAP benefits for the return of $100 in cash but could not sell the cigarettes. The clerk stated that he would charge $170 in SNAP benefits for the return of $100 cash. The clerk initially charged the EBT card $70.43 and then an additional $100.13. The clerk returned the EBT card, along with the $100 cash and a receipt. The receipt identified the terminal used as LK236166.

O.    SUBJECT PREMISES 15

75.    SUBJECT PREMISES 15 is 1184 Broadway, Brooklyn, NY and is owned by Adeeb Saleh.

76.    On or about September 7, 2014, Adeeb Saleh entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK133341, a terminal capable of processing EBT cards to redeem SNAP benefits.

77.    At the time, SUBJECT PREMISES 15 was authorized to accept SNAP benefits. On January 17, 2012, SUBJECT PREMISES 15 was authorized to participate in SNAP

_____

[13] Law enforcement officers conducted audio- and video-recordings of each of the described transactions conducted by CI-2 at SUBJECT PREMISES 14.

with Maged A Swadh as the owner. The store redeemed SNAP benefits through April 26, 2014 using an EBT terminal issued by JP Morgan Chase.

78.     On or about and between April 23, 2013 and February 21, 2014, SUBJECT PREMISES 15 using EBT terminal LK133341 redeemed $55,643.43 in SNAP benefits using FNS authorization number 0295050. That FNS authorization number was assigned to Classic Deli Corp, a retailer previously authorized by FNS to accept SNAP benefits and not located at SUBJECT PREMISES 15. On or about and between July 28, 2014 and August 8, 2014, SUBJECT PREMISES 15 began using EBT terminal 725 and redeemed $1,741.78 using the same FNS authorization number. On or about and between April 22, 2014 and August 8, 2014, SUBJECT PREMISES 15 using terminal 1319 redeemed 96,431.38 in SNAP benefits using FNS authorization number 0444345. That authorization number is assigned to 77 Deli Inc., a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 15.

79.     On or about February 26, 2014, CI-2 entered SUBJECT PREMISES 15 with an undercover EBT card and located two muffins and rubbing alcohol, an ineligible item before approaching the counter.[14] CI-2 asked the clerk at the counter for two packs of cigarettes and $50 cash. The clerk stated he could not give cash back, only the boss who comes in after ten o'clock at night, could do that. He could however allow the purchase of anything in the store including beer. CI-2 grabbed a six pack of Corona. The clerk charged the undercover EBT card $28.50 for the muffins, rubbing alcohol and two packs of cigarettes

---

[14] Law enforcement officers conducted audio- and video-recordings of each of the described transactions conducted by CI-2 at SUBJECT PREMISES 15.

and then $15 for the beer. The clerk returned the card along with a receipt to CI-2. The receipt identified the terminal used as 06939E, an EBT terminal issued by JP Morgan Chase.

80.     On or about March 3, 2014, CI-2 entered SUBJECT PREMISES 15 with an undercover EBT card and approached the counter. CI-2 asked the clerk at the counter for three packs of cigarettes and $100 cash. The clerk stated that he could not give cash back, only the "other guy" who would be in after eleven thirty at night. The clerk charged the EBT card $36 and returned it along with the cigarettes and a receipt to CI-2. The receipt identified the terminal used as 06939E.

81.     On or about March 12, 2014, CI-2 entered SUBJECT PREMISES 15 with an undercover EBT card and approached the counter. CI-2 asked the clerk at the counter for two packs of cigarettes. The clerk took the EBT card, charged it $24 and returned it along with the cigarettes and a receipt to CI-2. The receipt identified the terminal used as 06939E.

82.     On or about April 2, 2014, CI-2 entered SUBJECT PREMISES 15 with an undercover EBT card and approached the counter. CI-2 asked the clerk at the counter for a pack of cigarettes and $50. The clerk stated he would charge $75 in SNAP benefits for the return of $50 in cash. The clerk took the EBT card, charged it $86.99 and returned it along with the cigarettes, cash and a receipt to CI-2. The receipt identified the terminal used as 06939E.

83.     On or about July 15, CI-2 entered SUBJECT PREMISES 15 with an undercover EBT card and approached the counter. CI-2 asked the clerk at the counter for

two packs of cigarettes. The clerk took the EBT card, charged it $24 and returned it along with the cigarettes and a receipt to CI-2. The receipt identified the terminal used as 06939E.

P.    SUBJECT PREMISES 16

84.    SUBJECT PREMISES 16 is 1717 Broadway, Brooklyn, NY and is owned by Hunied Alahmed.

85.    On April 14, 2014, Hunied Alahmad entered into a contract with TAREB. Under the contract, TAREB provided EBT terminal LK324099, a terminal capable of processing EBT cards to redeem SNAP benefits.

86.    At the time, SUBJECT PREMISES 16 was not authorized to accept SNAP benefits. On April 23, 2014, SUBJECT PREMISES 16, under the ownership of Muswar Naji, voluntarily withdrew from SNAP. On July 2, 2014, Hunied Alahmad applied to participate in SNAP at SUBJECT PREMISES 16. The application was considered withdrawn when requested information was not received by FNS as required.

87.    On or about and between April 16, 2014 and August 10, 2014, EBT terminal LK324099 redeemed $62,480.35 in SNAP benefits using FNS authorization number 0405278. That authorization number is assigned to H&L 168 Grocery, a retailer previously authorized by FNS to accept SNAP benefits, and not located at SUBJECT PREMISES 16.

## ITEMS TO BE SEIZED

1.    Based on my training and experience, I know that retailers that are involved in a conspiracy to commit food stamp benefit fraud or trafficking routinely maintain EBT cards that FNS has not authorized them to use and employ such cards as improper credit and to facilitate unlawful SNAP transactions. Possession and use of EBT cards by

39

unauthorized persons is not permitted by FNS.

2.      As set forth above, the SUBJECT PREMISES are processing EBT transactions using EBT terminals with FNS authorization numbers assigned to other retailers and not the SUBJECT PREMISES; and some of the SUBJECT PREMISES are using EBT terminals for trafficking. Possession and use of such EBT terminals and related equipment (including PIN pads, card swipe devices, and receipt printers) at the SUBJECT PREMISES is not permitted by FNS.

3.      Based on my training and experience, I know that retailers that are involved in a conspiracy to commit food stamp benefit fraud or trafficking routinely maintain bundles of United States currency separate and apart from the United States currency in their cash register drawer (sometimes in closed and locked containers), or maintain United States currency in excess of $1,000 in their cash register drawer, to facilitate unlawful SNAP transactions. Based on my training and experience, I know that retailers similar in size to the SUBJECT PREMISES that are not involved in a conspiracy to commit food stamp benefit fraud or trafficking do not routinely maintain bundles of United States currency separate and apart from the United States currency in their cash register drawer or maintain United States currency in excess of $1,000 in their cash register drawer.

4.      Based on my training and experience, I know that retailers that are involved in a conspiracy to commit food stamp benefit fraud or trafficking routinely maintain ledgers and other documents reflecting EBT transactions (sometimes in closed and locked containers). As set forth above, the SUBJECT PREMISES are processing EBT transactions using EBT terminals with FNS authorization numbers assigned to other retailers and not the

40

SUBJECT PREMISES; and some of the SUBJECT PREMISES are using EBT terminals for trafficking. Therefore, ledgers and other documents reflecting EBT transactions at the SUBJECT PREMISES would constitute evidence of crime.

5.      Based on my training and experience and the facts set forth above, I know that retailers that are involved in a conspiracy to commit food stamp benefit fraud or trafficking routinely maintain materials and equipment relating to SNAP including licenses, application materials, notices, training materials, records of redemptions, and services records (sometimes in closed and locked containers). As set forth above, the SUBJECT PREMISES are processing EBT transactions using EBT terminals with FNS authorization numbers assigned to other retailers and not the SUBJECT PREMISES; and some of the SUBJECT PREMISES are using EBT terminals for trafficking. Therefore, such materials and equipment would tend to show the perpetrators' and co-conspirators' knowledge of SNAP and SNAP requirements and would constitute evidence of crime.

6.      Based on my training and experience, I know that retailers that are involved in a conspiracy to commit food stamp benefit fraud or trafficking routinely communicate with employees, owners, and operators of the retail location concerning EBT transactions and SNAP.

7.      Based on my training and experience, I know that retailers that are involved in a conspiracy to commit food stamp benefit fraud or trafficking routinely maintain business records in various forms (sometimes in closed and locked containers) that evidence the fraud and trafficking and evidence where unlawful profits from unauthorized EBT transactions are being diverted.

8.  Based on my training and experience, I know that retailers that are involved in a conspiracy to commit food stamp benefit fraud or trafficking routinely use a different name on the FNS application than the name of the owner or operator of the retailer, in order to conceal and perpetuate the fraud or trafficking. Indicia of occupancy, residence and/or ownership of the SUBJECT PREMISES and other premises related to the SUBJECT PREMISES (by common ownership) would evidence the identity of the perpetrators and co-conspirators of the fraud or trafficking.

9.  Based on my training and experience, I know that retailers that are involved in a conspiracy to commit food stamp benefit fraud or trafficking routinely maintain articles of personal property including personal address/telephone books, telephone bills, papers and documents consisting of lists of names and/or numbers, cellular telephones, and SIM cards, that evidence communications with perpetrators of the fraud or trafficking. Furthermore, based on my involvement in this investigation, I know that TAREB uses cellular telephones and text messages to communicate with retailers who are conducting unauthorized EBT transactions. Based on the facts of this investigation, there is probable cause to believe that communications among perpetrators and co-conspirators of food stamp benefit fraud or trafficking and other evidence of crime exists on the cellular telephones and SIM cards of owners or operators of the SUBJECT PREMISES including: Ali Ahmed, Dwayne Whitaker, Sulhiman Mubarez, Mohamed Al-Marisi, Yahya Ahmed, Hemyar Kassim, Majed Eltobah, Dana Jones, Ebrahim Mohamed, Abdulfatah Saleh, Khaled Nagi, Ahmed Abdul, Imad Said, Khaled Nagi, Ahmed Abdul, Adeeb Saleh, and Hunied

42

Alahmed.[15]

10.     Based on my training and experience, I know that retailers that are involved in a conspiracy to commit food stamp benefit fraud or trafficking routinely maintain articles of personal property (sometimes in closed and locked containers) with a value in excess of $1,000 that constitute proceeds derived from unlawful profits from food stamp benefit fraud or trafficking.

11.     Based on my training and experience, I know that retailers routinely maintain video surveillance cameras and other recording devices focused on the area in and around the cashier or cash register area, which typically includes the EBT terminal.

## METHODS TO BE USED TO SEIZE AND SEARCH
## COMPUTERS AND COMPUTER-RELATED EQUIPMENT

1.     Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that recordings from video surveillance cameras and other recording devices can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that searching computerized information for evidence or instrumentalities of a crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.  This is true for the following reasons:

---

[15] This warrant does not seek authorization to physically search individual persons for the purpose of seizing the foregoing cellular telephones and SIM cards.

a.      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing up to 40 gigabytes of data are now commonplace in desktop

44

computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of millions of pages of data.

        d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

2. In searching for recordings from video surveillance cameras and other recording devices, law enforcement personnel executing this search warrant will employ the following procedure:

        e.    Upon securing the premises, law enforcement personnel will seize any computers, computer equipment (including peripherals), cellular telephones, mobile devices, and related storage devices – all of which are capable of storing and concealing recordings from video surveillance cameras and other recording devices – and transport these items to an appropriate law enforcement laboratory for review as to whether

these items contain contraband. Because of the lengthy period of time necessary to perform a complete search of all electronic material contained in the devices, it would not be feasible to conduct this search at the SUBJECT PREMISES, and seizure is necessary so that the preservation of data is not jeopardized. The electronic devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

        f.      The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

        g.      Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the criminal infringement of copyrights.

        h.      In searching the data, the computer personnel may examine all of the data contained in the seized devices to view their precise contents and determine

whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth in this affidavit.

          i.     Once the computer personnel determine that the electronic devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the Government will promptly return these items.

          3.     I respectfully submit that there is probable cause to believe that the SUBJECT PREMISES contains evidence, instrumentalities, and/or fruits of violations of Title 7, United States Code, Section 2024, and Title 18, United States Code, Sections 371 and 641, as set forth in Attachment B.

          4.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application. I believe that sealing these documents is necessary because, given the confidential nature of this investigation, disclosure would severely jeopardize the investigation in that it might alert the target of the investigation to the existence of an investigation and likely lead to the destruction and concealment of evidence and flight of the target.

## CONCLUSION

        WHEREFORE, your deponent respectfully requests that the requested search warrant be issued to search THE PREMISES KNOWN AND DESCRIBED AS THE

PREMISES KNOWN AND DESCRIBED AS THE STORES SET FORTH IN

ATTACHMENT A and all locked and closed containers found therein (collectively, the

"SUBJECT PREMISES"), further described in Attachment A, for the things described in

Attachment B, which constitute evidence, fruits, and instrumentalities of food stamp benefit

fraud, in violation of Title 7, United States Code, Section 2024, conspiracy to commit food

stamp benefit fraud, in violation of Title 18, Untied States Code, Section 371, and theft of

public money, in violation of Title 18, United States Code, Section 641.

IT IS FURTHER REQUESTED that this Court issue an order sealing, until

further order of the Court, all papers submitted in support of this application including the

application and search warrants.

Dated: Brooklyn, New York
      September 22, 2014

ELIZABETH GREANEY
Special Agent
USDA-OIG


Sworn to before me this
22nd day of September, 2014


THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

48

## ATTACHMENT A – PREMISES TO BE SEARCHED

SUBJECT PREMISES 1 is 258 Marcus Garvey Boulevard, Brooklyn, NY



SUBJECT PREMISES 2 is 161 Buffalo Avenue, Brooklyn, NY



SUBJECT PREMISES 3 is 636 Throop Avenue, Brooklyn, NY



SUBJECT PREMISES 4 is 1060 Fulton Street, Brooklyn, NY



SUBJECT PREMISES 5 is 532 Gates Avenue, Brooklyn, NY



SUBJECT PREMISES 6 is 715 Dumont Avenue, Brooklyn, NY



SUBJECT PREMISES 7 is 3602 Neptune Avenue, Brooklyn, NY



SUBJECT PREMISES 8 is 603 Clinton Street, Brooklyn, NY



SUBJECT PREMISES 9 is 782 Franklin Avenue, Brooklyn, NY



SUBJECT PREMISES 10 is 894 Myrtle Avenue, Brooklyn, NY



SUBJECT PREMISES 11 is 77 Van Buren Street, Brooklyn, NY



SUBJECT PREMISES 12 is 772 Blake Ave, Brooklyn, NY



SUBJECT PREMISES 13 is 333 Pulaski Street, Brooklyn, NY



SUBJECT PREMISES 14 is 69 Putnam Avenue, Brooklyn, NY



SUBJECT PREMISES 15 is 1184 Broadway, Brooklyn, NY



SUBJECT PREMISES 16 is 1717 Broadway, Brooklyn, NY



## ATTACHMENT B – ITEMS TO BE SEIZED

Items to be seized at the premises are:

1.      Evidence, instrumentalities, and/or fruits of violations of Title 7, United States Code, Section 2024, and Title 18, Untied States Code, Sections 371 and 641.

a.      Electronic benefits transaction ("EBT") cards;

b.      Equipment used in connection with EBT card transactions including EBT terminals, PIN pads, card swipe devices, and receipt printers;

c.      Bundles of United States currency and other United States currency used to facilitate Supplemental Nutritional Assistance Program ("SNAP") transactions;

d.      Ledgers and other documents reflecting EBT transactions;

e.      Any and all materials/equipment relating to SNAP including licenses, application materials, notices, training materials, records of redemptions, and services records;

f.      Documents reflecting communications among employees and owners or operators of the SUBJECT PREMISES concerning EBT transactions or SNAP;

g.      Business records in various forms, including receipts, bank statements, checks, deposit and withdrawal slips, records of inventory, sales reports, accounting ledgers and journals, invoices, financial statements, payroll records, tax returns, personnel records, and correspondence with the USDA;

h.      Indicia of occupancy, residency and/or ownership of the premises to be searched and other premises;

i.      Articles of personal property evidencing the existence of a conspiracy to commit food stamp benefit fraud or theft of public money, including personal address/telephone books, telephone bills, papers and documents consisting of lists of names and/or numbers, and the cellular telephones and SIM cards of owners or operators of the SUBJECT PREMISES including: Ali Ahmed, Dwayne Whitaker, Sulhiman Mubarez, Mohamed Al-Marisi, Yahya Ahmed, Hemyar Kassim, Majed Eltobah, Dana Jones, Ebrahim

65

Mohamed, Abdulfatah Saleh, Khaled Nagi, Ahmed Abdul, Imad Said, Khaled Nagi, Ahmed Abdul, Adeeb Saleh, and Hunied Alahmed;[16]

    j.  Articles of personal property with a value in excess of $1,000 evidencing the obtaining, secreting, transfer, expenditure and/or concealment of money and assets derived from or to be used in conspiracy to commit food stamp benefit fraud or theft of public money, including stock and bond certificates and records, books, receipts, records, bank statements and records, business records, money drafts, money orders and cashier check receipts, vehicle titles, registrations, purchase documents, property deeds, escrow papers, passbooks, bank checks, money counters, safes and records of safety deposit boxes and storage lockers; and

    k.  Recordings from video surveillance cameras and other recording devices, including but not limited to computers and removable media containing such recordings.

---

[16] This warrant does not grant authorization to physically search individual persons for the purpose of seizing the foregoing cellular telephones and SIM cards.